FILED
FEB 10 2017

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | 3:15-CR-30021-RAL |
|---|---|
| Plaintiff, | |
| vs. | OPINION AND ORDER ON THE INVOLUNTARY ADMINISTRATION OF ANTIPSYCHOTIC MEDICATIONS |
| GRAHAM GARNOS, | |
| Defendant. | |

The United States charged Graham Garnos with violating 18 U.S.C. § 875(c), Interstate Communications with Threat to Injure, on March 4, 2015. Doc. 1. On April 20, 2015, this Court granted the United States' motion to transport Garnos to a federal medical center to determine his mental competency to stand trial and aid in his own defense, pursuant to 18 U.S.C. § 4241. Doc. 17. Following several competency hearings and reports on Garnos' mental status and evaluations, Docs. 38, 45, 49, this Court determined that Garnos was not competent to stand trial and aid in his defense within the confines of § 4241, and ordered him to be hospitalized in an appropriate treatment facility for four months, "as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Doc. 50.

In the forensic report completed in those four months, Garnos' psychologist at the Federal Medical Center in Butner, North Carolina, Dr. Robert E. Cochrane, explained that Garnos was diagnosed with delusional disorder (persecutory type), and with amphetamine-type

1

substance, cocaine, and opioid use disorders; and that "Garnos' extensive history of substance abuse further clouds any concise explanation for his psychiatric symptoms." Doc. 69 at 11. Dr. Cochrane reported that Garnos was refusing all mental health treatment and determined that "it is unlikely that Mr. Garnos will be competent to stand trial in the foreseeable future without involuntary treatment." Doc. 69 at 14. The medical staff submitted a follow up addendum to the forensic report several months later after the Court requested additional analysis to include recently released medical records, a proposed treatment plan, and the factors needing medical analysis for the completion of a Sell hearing. Gov't Ex. 2.

After Garnos' continued refusal to participate in treatment or take psychiatric drugs of any sort,[1] Docs. 69, 76, the United States filed a motion on December 27, 2016 to determine whether involuntary administration of anti-psychotic drugs was appropriate to restore competency, Doc. 77. This hearing, consistent with the requirements established by the Supreme

---

[1] Garnos has consistently and repeatedly denied that he suffers from any mental health problems or any delusional disorder. Garnos has consistently and repeatedly refused treatment while at the Federal Medical Center in Butner, expressing a concern that his side of the story is not being listened to or investigated. As reviewed by this Court, throughout his blog postings, internet videos, emails, and psychological evaluations, Garnos has consistently referenced his belief that his mother, brother, and step-father have conspired to murder him at various points between 2007 and 2014, primarily through the use of heavy-metal poisoning from the chemical thorium. Garnos alleges that various members of the South Dakota law enforcement community, government actors, lawyers, and judges have attempted to cover up these events. The alleged cover-up also includes, according to Garnos, the murder of an Iowa Court of Appeals judge by Garnos' stepfather, from heavy-metal poisoning. Garnos has told this Court that he is a witness to multiple murders. During hearings, Garnos has been respectful of the Court, but prone to talk about conspiracies against him involving silencing him for what he knows about murders and attempted murders, all while his counsel tends to try to shut him down. Garnos was evaluated separately by his own psychological expert, but has chosen not to file that report. All reports submitted to the court deem Garnos incompetent due to a delusional or similar disorder. While every human has a different perception of reality, Garnos' perception of a reality where many people are out to kill him using obscure heavy metals and radioactive materials, and dozens of community members across South Dakota, Minnesota, Tennessee, Iowa, Nebraska, and Pennsylvania have been involved in cover-ups, is sufficiently divorced from reality to support the evaluations and diagnoses made by the qualified professionals assigned to his care.

2

Court in Sell v. United States, 539 U.S. 166 (2003), was held on January 31, 2017. At the hearing, Dr. Cochrane testified regarding Garnos' competency and the substance of the two forensic health examinations submitted to the Court. Based on the evidence presented at the hearing, and this Court's review of the record, the United States' request for the involuntary administration of anti-psychotic drugs is granted, provided that Garnos first be given a fourteen-calendar day opportunity to voluntarily comply with this Court's order through the use of prescribed oral antipsychotic medications.

I. **Sell Factors**

In Sell, the Supreme Court considered "whether the Constitution permits the Government to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant—in order to render that defendant competent to stand trial for serious, but nonviolent, crimes." 539 U.S. at 169. The Supreme Court created four criteria for a court to consider before ordering the involuntary administration of antipsychotic drugs to avoid any unconstitutional deprivation of a defendant's "'liberty' to reject medical treatment." 539 U.S. at 178 (quoting U.S. Const. amend. V); see also Riggins v. Nevada, 504 U.S. 127 (1992); Washington v. Harper, 494 U.S. 210 (1990). "[T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." Sell, 539 U.S. at 179. The Supreme Court admonished that these situations will be "rare." Id. at 180. It is a question of law for this Court to determine whether there are important governmental trial-related interests at stake, but the United States retains the burden of

proving, by clear and convincing evidence, the remaining three Sell requirements. See United States v. Nicklas, 623 F.3d 1175, 1178 (8th Cir. 2010). The Eighth Circuit has summarized the Sell requirements:

> First, "a court must find that important governmental interests are at stake," though "[s]pecial circumstances may lessen the importance of that interest." Second, "the court must conclude that involuntary medication will significantly further those concomitant state interests." This includes finding that "administration of the drugs is substantially likely to render the defendant competent to stand trial," and "[a]t the same time . . . that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Third, "the court must conclude that involuntary medication is necessary to further those interests" and that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Fourth, and finally, "the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." The Court then emphasized that the goal of this test is "to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial."

United States v. Fazio, 599 F.3d 835, 839 (8th Cir. 2010) (quoting Sell, 539 U.S. at 180–81) (internal citations removed).

## II. Discussion

### A. Presence of an Important Governmental Interest

First, this Court must determine whether the indictment filed against Garnos represents an important government interest in "bringing to trial an individual accused of a serious crime." Sell, 539 U.S. at 180. The defendant faces a statutory maximum penalty of five years' imprisonment for violation of 18 U.S.C. § 875(c), which involves an interstate communication with a threat to injure. Doc. 1. In involuntary medication cases, the Eighth Circuit has previously found that the United States had an important governmental interest in the prosecution of the same charged offense with an identical maximum sentence. Nicklas, 623 F.3d

4

at 1178 (finding an important interest in prosecuting a defendant who had threatened to kill one FBI agent per day); United States v. Levitas, No. CR 09-10025, 2010 WL 3909925, at *3 (D.S.D. Sept. 30, 2010) (finding an important governmental interest in prosecuting a defendant for making repeated threatening statements to a federal judge and assaulting federal officers while being taken into custody); see also United States v. Palmer, 507 F.3d 300, 304–05 (5th Cir. 2007) (affirming a finding that there was an important governmental interest in prosecuting a defendant who had previously been diagnosed with delusional disorder for threatening to murder a federal official where he was indicted for possessing a firearm after being adjudicated mentally defective, in violation of 18 U.S.C. § 922(a)(6)). Garnos is charged with the crime of threatening the murder of an individual through interstate communications. Doc. 1. While Garnos' alleged actions did not involve violence, they included the threat of severe violence.[2] This bolsters the United States' interest in prosecution to further "the basic human need for security," even though the maximum sentence for his crime is only five years. Sell, 539 U.S. at 180 (citing Riggins, 504 U.S. at 135–36). Garnos is alleged to have left a five minute voicemail on the victim's cell phone threatening to shoot her in the head, and including the names of the victim's husband and employer in the call. Doc. 78 at 5. In the voicemail, the caller makes the specific threat numerous times in various iterations: "if I ever see your face . . . ever, anywhere, you are going to die from a bullet to the head;" "the very first time I see you, I will kill you in self-defense;" and "if I ever see you again you will die from a bullet in your fucking head." Doc. 78 at 5.

---

[2] The Eighth Circuit has previously held that mailing a threatening letter was a crime of violence for purposes of the United States Sentencing Guidelines "Career Offender" § 4B1.1. United States v. Left Hand Bull, 901 F.2d 647 (8th Cir. 1990). However, the Eighth Circuit called this determination into question in Nicklas, 623 F.3d at 1180, after the Supreme Court's ruling in Begay v. United States, 553 U.S. 137 (2008).

5

This Court needs to consider whether there are any special circumstances that may lessen the important governmental interests at stake. Sell, 539 U.S. at 180. As was the case in Nicklas, Garnos has been in federal "custody for less than half the time for which he could be imprisoned if convicted of the charge of the Indictment." 623 F.3d at 1179; Doc. 1. Therefore, the United States retains an interest in preventing Garnos from committing any future crimes before he has completed any imposed sentence should he be convicted. See Sell, 539 U.S. at 180 ("The possibility that the defendant has already been confined for a significant amount of time . . . for which he would receive credit towards any sentence ultimately imposed . . . affects, but does not totally undermine, the strength of the need for prosecution."). Garnos has participated in mental health treatment and been a productive member of society through education and employment in the past, and has not been a danger to himself or others while at the Federal Medical Center in Butner, suggesting the possibility that a "lengthy confinement in an institution for the mentally ill . . . that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime" is not present in this case. Sell, 539 U.S. at 180; Doc. 69 at 4–7; Gov't Ex. 2 at 3–5; see also United States v. Gomes, 387 F.3d 157, 161 (2d Cir. 2004) (finding that the prospect of civil commitment was insufficient to undermine the United States' interest where the record was devoid of evidence that the defendant would qualify for civil commitment because his doctors had testified that he was not a danger to himself or others in the prison system). Therefore, this Court finds that the United States has an important interest in prosecuting Garnos for his alleged crime, and that there are no special circumstances in this case to lessen the importance of that interest.

## B. Involuntary Medication Will Significantly Further the Government's Interest

Under the second Sell factor, this Court must determine that the involuntary administration of antipsychotic medications will further the important governmental interest identified above. This requires the Court to find that the "administration of the drugs is substantially likely to render the defendant competent to stand trial," and that the "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181. The second forensic report prepared by Dr. Cochrane, and his testimony at the hearing, contained information on both the likelihood that antipsychotic drugs would restore Garnos to competency, and the likelihood of any serious side effects occurring that could interfere with Garnos' ability to assist his counsel in his defense. See Gov't Ex. 2 at 5–14.

The Supreme Court instructs that any proposed treatment must be "substantially likely" to render the defendant competent, and "substantially unlikely" to have interfering side effects. Sell, 539 U.S. at 181. In United States v. Ghane, the Eighth Circuit reversed a district court's finding that antipsychotic medication for delusional disorder was substantially likely to restore a defendant's competency where it offered only a "glimmer of hope." 392 F.3d 317, 320 (8th Cir. 2004). "A five to ten percent chance of restored competence cannot be considered substantially likely under any circumstances." Id. The court in Ghane referenced United States v. Gomes, where it was determined that a seventy percent success rate in treatment was substantially likely to restore a defendant's competency. Id. at n.2; 387 F.3d 157, 161–62 (2nd Cir. 2004). In the years since Ghane was decided, additional studies and research reports have found a substantially higher likelihood of restored competency from the use of antipsychotic medications to treat delusional disorder. See Gov't Ex. 2 at 23 (bibliography with all reports on antipsychotic

medicines dated after 2004 with one exception); United States v. Curtis, 749 F.3d 732, 736–37 (8th Cir. 2014) (crediting the new opinion of the same doctor that testified in the Ghane case because of his reliance on new studies of the response rates to antipsychotic medications in patients with delusional disorder).

At the hearing, Dr. Cochrane explained his opinion that there was a "substantial likelihood," in the range of 70–80%, that treatment of Garnos' delusional disorder with antipsychotic medicines would restore his competency for trial. Dr. Cochrane relied upon at least nine different scientific reports and studies to make this opinion, as detailed in his forensic report, Gov't Ex. 2, and was cross-examined on the principles of evidenced-based medicine and the nature of the studies he relied upon in making this determination. While the best available evidence that an individual will respond to certain medications comes from double-blind placebo-controlled studies, there are none available for the treatment of delusional disorders. See Gov't Ex. 2 at 6. Instead, the best available evidence is peer-reviewed observational studies, which is what Dr. Cochran relied upon. Gov't Ex. 2 at 6. A 2007 article published by Herbel[3] and Stelmach found that 77% of patients diagnosed with delusional disorder in that study had their competency restored after treatment through antipsychotic medication. Gov't Ex. 2 at 7. The Eighth Circuit, in commenting on this very article, stated that "[n]otwithstanding the Ninth Circuit's skepticism regarding the Herbel Study, we conclude that the district court's decision to credit [the doctor's] report and testimony was not clearly erroneous, since it constituted a permissible view of the evidence presented to it." Curtis, 749 F.3d at 737. Another study relied upon by Dr. Cochrane found that 73% of inmates with delusional disorder in that study were

---

[3] Dr. Bryon Herbel co-signed with Dr. Cochrane the latest report opining that the final three Sell factors were met to justify involuntary treatment of Garnos, and would be the physician prescribing the antipsychotic medication to Garnos at the Butner facility.

8

restored to competency following treatment with antipsychotic medicine.[4] Gov't Ex. 2 at 6. A 2006 study by Manschreck and Khan found the lowest level of success of antipsychotic medication used to treat delusional disorder, at only 50%. Gov't Ex. 2 at 7. However, as explained by Dr. Cochrane on cross-examination, this was not a study of only those who were involuntarily administered the treatment, and the issue of whether the patients had actually adhered to their prescribed medication regimen was not appropriately analyzed in the study.

Garnos' medical records establish that he has responded favorably to antipsychotic medications in the past, Doc. 69 at 14, although at the hearing he expressed his personal concerns over the side effects of one in particular—haloperidol.[5] Dr. Cochrane included in his forensic report that during one three-month span where Garnos was prescribed the antipsychotic quetiapine, he did not express a delusional belief system. Gov't Ex. 2 at 13; Doc. 71 at 59–79. Few medical records are available for Garnos that identify whether he experienced side effects during prior prescriptions of antipsychotic medications. Gov't Ex. 2 at 13. Dr. Cochrane testified that none of the three most commonly prescribed long-lasting injectable antipsychotic medications—haloperidol, fluphenazine, and risperidone—have high levels of side effects that would interfere with a defendant's ability to assist his counsel at trial. In the addendum to his forensic report, Dr. Cochrane identified the most common cognitive, neuromuscular, and metabolic side effects from antipsychotic medications. Dr. Cochrane opined that based on the

---

[4] This finding, published by Dr. Cochrane along with several co-authors, was a relatively small sample (fifteen defendants) from a larger study of 132 defendants suffering from various psychotic disorders who had been involuntarily treated with psychotropic medication.

[5] The side effects that Garnos expressed experiencing on haloperidol previously were the dulling of his memories of past murders and attempted murders he had witnessed. Dr. Cochrane refuted Garnos' concerns by stating that in his experience, individuals on antipsychotic medicines experience greater memory retention and clarity. Thus, haloperidol might be an effective drug, and Garnos' past experience on it signals a likelihood that his delusional disorder is treatable by antipsychotics.

research, Garnos would be unlikely to experience any side effects that could not be effectively managed that would result in him being unable to aid in his own defense. See Gov't Ex. 2 at 10–13. Dr. Cochrane explained that the Federal Medical Center in Butner has established procedures to monitor patients on antipsychotic medicines for side effects on an ongoing basis, and that Garnos would be evaluated at least once per month for the emergence of any delayed onset side effects. See Gov't Ex. 2 at 10–13. For these reasons, this Court finds that the United States has met its burden of proving by clear and convincing evidence both that the administration of antipsychotic drugs is substantially likely to render the defendant competent to stand trial and that the administration of those drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist his counsel in conducting a trial defense.

### C. Involuntary Administration of Medication is Necessary to Further the Government's Interest

Next, the United States must establish that the *involuntary* administration of these antipsychotic medicines is necessary to further the United States' interest because "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Sell, 539 U.S. at 181. As part of this consideration, this Court must determine whether any "less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power," would work to render the defendant competent before the more intrusive methods. Id. Garnos has been respectful of this Court throughout the proceedings, including during the most recent hearing. Garnos said that he would abide by any order of this Court, even if it was to specifically take the drug he disliked the most, haloperidol. Therefore, there might be a less intrusive option available of simply ordering Garnos to take any prescribed medication. This Court will order that Garnos take voluntarily as prescribed the oral antipsychotic

10

medications deemed appropriate by the Federal Medical Center psychiatrist for a period of one-hundred and twenty days as described under 18 U.S.C. § 4241(d).

However, in the event that Garnos does not obey the order and thereby breaks his promise to this Court, the third Sell factor must be analyzed. Dr. Cochrane testified and included in his report that Garnos, like most patients with delusional disorder, does not feel he suffers from a medical disorder. Indeed, Garnos has been consistent and adamant that he has no delusions at all. As a result, there is no possibility that Garnos currently would respond to psychotherapy, because he refuses to participate in the treatment. See Gov't Ex. 2 at 15. Furthermore, studies of patients with schizophrenia, which is similar to delusional disorder, have repeatedly found very limited efficacy of psychotherapy without medication. See Gov't Ex. 2 at 15. Individuals with delusional disorders rarely have their competency restored without some form of antipsychotic medication, and Dr. Cochrane testified that because Garnos has been at the Federal Medical Center in Butner for ten months and has shown no signs of improvement, there is no reason to believe that Garnos will become competent in the foreseeable future without antipsychotic medication. See Gov't Ex. 2 at 2–3. Therefore, the United States has shown by clear and convincing evidence that the involuntary administration of antipsychotic medication will be necessary if Garnos refuses to voluntarily take antipsychotic medications orally. This Court finds that the involuntary administration of antipsychotic medication is necessary, as an alternative if Garnos refuses to cooperate, and in that case, less intrusive treatments are unlikely to achieve substantially the same results.

### D. Administration of Drugs is Medically Appropriate

Finally, the United States must establish that "the administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition," taking

11

into consideration the specific kinds of drugs to be prescribed. <u>Sell</u>, 539 U.S. at 181. Garnos is medically stable and healthy, suffering from no chronic or acute medical ailments at this time. Doc. 69 at 5, 10; Gov't Ex. 2 at 16. Garnos is not currently taking any medications, so there is no risk of him suffering any drug-to-drug reactions. Gov't Ex. 2 at 16. As summarized above, antipsychotic medications have been determined to be effective for the treatment of schizophrenia and related psychotic disorders, like delusional disorder. <u>See</u> Gov't Ex. 2 at 16. Dr. Cochrane has established the effectiveness and likely side effects from the three long-lasting antipsychotic medications that can be used off-label at the Federal Medical Center in Butner for the treatment of delusional disorder—haloperidol, fluphenazine, and risperidone—and has ranked them in a proposed treatment plan according to effectiveness and Garnos' cooperation. <u>See</u> Gov't Ex. 2 at 16–20. Garnos has previously been prescribed antipsychotic medication in both community and treatment settings, and there were no medical reports that indicated any adverse reactions or side effects. Gov't Ex. 2 at 13, 16; Doc. 71 at 59–79. Dr. Cochrane expressed in testimony and in his report that "administering antipsychotic medication to Mr. Garnos is medically appropriate." Gov't Ex. 2 at 17. In rendering this opinion, Dr. Cochrane testified that he relied on all the previous medical records he had been provided for Garnos, which span nearly twenty years. <u>See</u> Doc. 69 at 2, 7; Gov't Ex. 2 at 2. The United States has met its burden of proving by clear and convincing evidence that the involuntary administration of antipsychotic drugs is medically appropriate.

### III. Conclusion

This Court has found Garnos to be intelligent and pleasant to converse with, notwithstanding his delusional disorder, and wants to see him fulfill his potential and become a safe, rational, and productive member of society. The involuntary administration of

antipsychotic medication is an extreme remedy, but this is a rare instance where it is appropriate to restore competency for trial. See Sell, 539 U.S. at 180. Based upon the exhibits presented at the hearing, the testimony of Dr. Cochrane, and the record as a whole, this Court finds that the Sell factors have been satisfied. The United States has expressed concern and uncertainty about the continued treatment of Garnos after the expiration of this one-hundred and twenty day order, due to the variations in local jail policies on the involuntary administration of antipsychotic medications. Hopefully, Garnos will come to recognize the benefit of the antipsychotic medication, cooperate in his care, and choose to voluntarily continue taking the medication. At any rate, this Court believes that monthly reports of Garnos' status will allow the Court to address concerns about Garnos' future well-being as they arise at the end of the court-ordered period. Therefore, it is hereby

ORDERED that Garnos is court-ordered to voluntarily take as prescribed any oral antipsychotic medications deemed appropriate by any physician at the Federal Medical Center in Butner for a period of one-hundred and twenty days; it is further

ORDERED that if Garnos does not voluntarily take the prescribed oral antipsychotic medications within a period of fourteen calendar days from this order, or discontinues taking antipsychotics voluntarily, the Federal Bureau of Prisons is authorized and directed to involuntarily administer the antipsychotic drugs as deemed appropriate by the treating psychiatrist at the Federal Medical Center in Butner consistent with Dr. Cochrane's proposed treatment plan, Gov't Ex. 2 at 17–20, for a period of one-hundred and twenty days in order to restore Garnos' competency; it is further

ORDERED that the medical staff at the Federal Medical Center in Butner is authorized to perform the necessary physical and laboratory assessments and monitoring that have been

clinically determined to monitor the side effects from the antipsychotic medications prescribed; it is finally

ORDERED that the Federal Medical Center in Butner shall report to this Court monthly in writing on the progress of Garnos, with the first report due after the expiration of the initial fourteen day period.

DATED this 10th day of February, 2017.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE